THE BANK OF NAPERVILLE, Plaintiff-Appellee and Cross-Appellant, *v.* ROBERT A. CATALANO *et al.*, Defendants-Appellants and Cross-Appellees.

Second District   No. 79-526

Opinion filed July 25, 1980.

Robert W. Ward, of Cook, Wetzel & Egan, Ltd., of Chicago, for appellants.

Jeffry J. Knuckles, of Fawell, James & Brooks, of Naperville, for appellee.

Mr. JUSTICE LINDBERG delivered the opinion of the court:

Defendants, Robert and Beth J. Catalano, appeal from a judgment of the Circuit Court of Du Page County ordering them to make restitution to plaintiff, the Bank of Naperville. Restitution was ordered to be made by the Catalanos jointly in the amount of $2,780.94, by Robert Catalano individually in the amount of $1,825.45, and by Beth J. Catalano individually in the amount of $35.97. The bank cross-appeals the trial court's denial of its claim for interest and attorney's fees.

The business relationship between the parties began on April 3, 1975, when the Catalano's took up residence on real estate in Naperville and retained the former owner's real estate trust with the bank. The Catalano's thereafter conducted various transactions with the bank, including the maintenance of a checking account and a commercial loan account. Mr. Catalano testified at trial to instances where the bank had paid checks over stop-payment orders and failed to honor checks when sufficient funds to cover them were on deposit.

On September 13, 1975, Mrs. Catalano took out a $4,000 loan from the bank, secured by a note on which Mr. Catalano was guarantor. The note was renewed seven times and was due following the last renewal on July 5, 1977. As of August 3, 1977, the note was approximately 30 days

past due, and Mrs. Catalano's checking account was overdrawn in the amount of $35.95. Mr. Stearns, the bank's president, determined that the loan was a "troublesome credit" which had been renewed too many times and that there was considerable difficulty with the checking account. Accordingly, he instructed that the checking account be closed and that the loan be paid off.

On August 4, 1977, Mr. Catalano went to the bank's drive-in window to make a deposit. The teller asked him to step inside, at which time an employee told him that his deposit could not be accepted and that his account had been closed. The employee tendered to Mr. Catalano a group of documents, including a paid-up loan statement, a cashier's check drawn on the bank for $1,825.45 and the documents which had accompanied the attempted deposit. Mr. Catalano refused to accept these papers and asked to see the bank president. He was shown into Mr. Stearns' office shortly thereafter. Mr. Stearns testified that he told Mr. Catalano that the bank would charge his savings account for the principal and interest due on the note and for the overdraft, with the balance being returned to him in the form of a cashier's check. Mr. Catalano admitted at one point that Stearns had said the money came from a savings account, but elsewhere denied having been so informed. Mr. Catalano stated that his money was "scattered all over," implying that he was uncertain as to which accounts had been used by the bank to produce the cashier's check.

Mr. Stearns testified that Catalano had thereafter made a telephone call from the bank lobby and cashed the check. According to Mr. Stearns, Catalano then threatened Stearns' life and Stearns called the police. Following arrival of the police, Catalano left the premises. Mr. Catalano, on the other hand, denied threatening Stearns' life. Catalano testified that Stearns had said that the bank did not choose to do business with people of Catalano's character, and that Stearns had called the police when he had refused to accept the various papers given to him. The police advised Catalano to accept the documents, so Catalano, not trusting the bank, had cashed the cashier's check and departed.

Subsequent to these events, it was discovered that defendants did not maintain a savings account at the Bank of Naperville, and that the money which the bank had applied to the overdraft, the loan and the cashier's check had been inadvertently taken from the savings account of a third party who coincidentally was also named Robert Catalano. Mr. Stearns admitted that preparation of the cashier's check had been done in "a less than careful manner."

This lawsuit followed.

Three issues are presented by this appeal: (1) whether a bank which erroneously applies funds on deposit from one party to obligations owed the bank by a second party may obtain restitution of those funds from the

second party, (2) whether the bank was erroneously denied interest and/or attorney's fees, and (3) whether the Catalano's are entitled to attorney's fees for the defense of the bank's cross-appeal.

## I.

■■■ As a general rule, where money is paid under a mistake of fact, and payment would not have been made had the facts been known to the payor, such money may be recovered. The fact that the person to whom the money was paid under a mistake of fact was not guilty of deceit or unfairness, and acted in good faith, does not prevent recovery of the sum paid, nor does the negligence of the payor preclude recovery. *Board of Education v. Holt* (1976), 41 Ill. App. 3d 625, 354 N.E.2d 534; *Salvati v. Streator Township High School District No. 40* (1964), 51 Ill. App. 2d 1, 200 N.E.2d 122.

The Catalanos, citing *Central Bank & Trust Co. v. General Finance Corp.* (5th Cir. 1961), 297 F.2d 126, argue that special rules of restitution apply in the case of commercial banks, and that the amount paid by a bank on its customer's check under a mistaken belief that the customer had sufficient funds to his credit to cover the checks is not recoverable in an action for restitution where there is no showing of fraud, misrepresentation or overreaching. The Catalanos also contend that inasmuch as a bank has a duty to know the state of its depositors' accounts, it must abide by the consequences of any mistakes it makes in administering those accounts. (See *Citizen's Bank v. Schwarzschild & Sulzberger Co.* (1909), 109 Va. 539, 64 S.E. 954.) In *Central Bank & Trust Co.*, the bank paid the holder of the check in the mistaken belief that the drawer had sufficient funds on deposit. However, the payee stopped payment on certain checks to the drawer, resulting in the drawer's account being insufficient to cover the check to the payee. The bank was denied restitution against the payee, the court finding inapplicable the general rule allowing recovery of funds paid under a mistake of fact. Part of the court's rationale was that while the bank was in a position to know the state of its own accounts, the payee had no means of knowing the state of the drawer's account. *Citizen's Bank of Norfolk* also involved a ruling against restitution where the bank had made a payment on an instrument under the mistaken belief that the drawer had sufficient money on deposit to the bank to cover the payment. In the course of denying restitution, the court discussed the pertinent rules:

> "The general rule is that money paid under a mistake of fact may be recovered, but the payment of a check or note by a bank upon which it is drawn, or at which it is made payable, under the mistaken belief that the drawer of the check or the maker of the note has sufficient funds to his credit to pay the check or note,

seems to be an exception to the general rule. The cases do not seem to be entirely agreed upon what principle this exception is based * * *. Some place it upon the ground that there is no privity between the holder of the check or note and the bank; others upon the ground that since the bank always has the means of knowing the state of the depositor's account by simply looking at his own books, the payment is not a payment by mistake within the meaning of the legal rule which permits a recovery; others still place their decision upon both grounds." *Citizen's Bank*, 109 Va. 539, 541-42, 64 S.E. 954, 955.

The situation in *Central Bank and Trust* and *Citizen's Bank* is distinguishable from the case at bar. Mr. Catalano was not simply a holder of an instrument presenting it for payment. Rather, he was informed that the cashier's check represented the proceeds of an account which he had previously maintained in the bank and which was being closed. The bank president testified that he informed Mr. Catalano that the funds being given to him purportedly came from his savings account, and even if defendant did not understand the reference to a savings account specifically, he apparently understood that the money was supposedly from funds that he had previously had on deposit. Mr. Catalano was therefore in a different position from a holder in due course of an instrument who in good faith presents it for payment.

The next question presented is whether the payment to the Catalanos was actually made in consequence of a mistake of fact. The Catalanos reply in the negative, contending that there can be no recognized mistake of fact where facts were readily ascertainable, where the channels of information were open, where there was a failure to investigate known facts or where there was carelessness, indifference or inattention. They cite *John J. Calnan Co. v. Talsma Builders, Inc.* (1977), 67 Ill. 2d 213, 367 N.E.2d 695, and *Steinmeyer v. Schroeppel* (1907), 226 Ill. 9, 80 N.E. 564, for the proposition that a mistake of fact must not be due to negligence, but both of those cases involved discussions of the conditions necessary before a contract will be rescinded for a mistake by one of the parties. While it has been held that a court of equity will not relieve a party from a mistake which was the result of his own negligence when the channels of information are open to him and no fraud or deception is practiced upon him (*National Union Fire Insurance Co. v. John Spry Lumber Co.* (1908), 235 Ill. 98, 85 N.E. 256), that holding came in the course of an action by certain insurance companies to reform their policies because of mistakes made in the descriptions of the location of the property intending to be covered, such actions coming after the property was destroyed. These cases do not stand for the proposition that a party erroneously receiving money may keep it simply because the payment was negligently made.

■■ The Catalanos contend that inasmuch as the bank knows what its agents know, the instant plaintiff had actual knowledge that its payment was in error. This overlooks that, despite apparent negligence, there is no evidence that any of the bank's agents actually knew of the error. In our view, the bank's good faith misidentification of its depositor is a mistake of fact, entitling the bank to restitution of amounts erroneously paid to the erroneously identified party. The Catalanos characterize the bank's conduct as reckless and vengeful, but the record does not reveal any deliberate misconduct on its part. The bank may have been negligent in debiting the wrong account. However, as noted above, restitution will generally not be precluded because an overpayment was made negligently.

The Catalanos, referring to the trial court's citation of the Restatement of Restitution §59 (1937), further contend that restitution may not be ordered in the instant case because they have made a change of position in reliance on the mistaken payment, thereby defeating the bank's claim. The change of position to which defendants refer was their alleged failure to bring suit against the bank for wrongfully paying an $8,400 check over defendant's stop payment order.

■■ It is true that when one party is misled by the representations or conduct of another and acts on these representations to his injury, the party making the representation may be "estopped" from asserting a legal right. (*Moline I.F.C. Finance, Inc. v. Soucinek* (1968), 91 Ill. App. 2d 257, 234 N.E.2d 57.) However, in the instant case, there is no evidence that the Catalanos changed their position or suffered any permanent injury as a result of their alleged failure to sue the bank on their unrelated claim. We can see no reason why this failure to stop-payment claim could not have been brought as a counterclaim in the instant action. (See section 38 of the Civil Practice Act, Ill. Rev. Stat. 1977, ch. 110, par. 38.) Also, there has been no allegation that this claim has been barred by any statute of limitations and thus we must assume that it could be prosecuted in the future. In sum, we find that even if the Catalanos had deferred bringing suit against the bank as some sort of extrajudicial set-off, such a deferral was not a change of position under section 59 of the Restatement of Restitution. Accordingly, the trial court's award of restitution is affirmed.

## II.

■■ The bank has cross-appealed from the trial court's judgment denying its claims for interest and attorney's fees. The Catalanos contend the bank cannot rely on interest and fees language in the note because the note was discharged. Article 3, section 3—605(1)(b) of the Uniform Commercial Code provides that the holder of a note may, even without consideration, discharge the note by surrender of the instrument to the party to be

discharged. (Ill. Rev. Stat. 1977, ch. 26, par. 3—605(1)(b).) The bank argues that this rule does not apply in a case of a mistaken surrender. While it is true that in some cases the underlying obligation under a promissory note is not extinguished by the lender mistakenly stamping the note paid (see *First Galesburg National Bank & Trust Co. v. Martin* (1978), 58 Ill. App. 3d 113, 373 N.E.2d 1075, a case which did not involve claims of interest or attorney's fees), this case calls for a different result. Unlike the *First Galesburg* cases, the note in this case was surrendered to its maker by the holder with the intention that it be discharged. The mistake concerned the source of the funds to pay the note and the act of surrender. Moreover in the instant case, the bank's surrender of the note precluded the Catalanos from paying off the note themselves and thus it would be unfair to allow the bank recovery beyond the restitution granted by the trial court.

In the alternative, the bank argues that it was entitled to fees and expenses pursuant to section 41 of the Civil Practice Act (Ill. Rev. Stat. 1977, ch. 110, par. 41.) Section 41 provides that:

"Allegations and denials, made without reasonable cause and found to be untrue, shall subject the party pleading them to the payment of reasonable expenses, actually incurred by the other party by reason of the untrue pleading, together with a reasonable attorney's fee, to be summarily taxed by the court upon motion made within 30 days of the judgment or dismissal."

The bank contends that it is entitled to fees by virtue of defendants' denial of paragraph 13 of the complaint. That paragraph alleged that the Catalanos knew or should have known that the funds from the savings account were not owned by them and that they had a duty to notify the bank of the mistake as to the ownership of that account.

The bank asserts that it was error to deny its section 41 motion without a hearing. The Catalanos counter that the trial court is not required to conduct a hearing where, as here, it determines that no threshold issue of a false pleading has been raised. Moreover, the Catalanos assert that paragraph 13 of the complaint involves surplusage unnecessary to the establishment of the bank's cause of action, and that section 41 will not permit recovery for attorney's fees incurred in establishing such unnecessary matter.

The necessity of holding a hearing on a section 41 motion for fees was recently discussed in *Grover v. Commonwealth Plaza Condominium Association* (1979), 76 Ill. App. 3d 500, 512, 394 N.E.2d 1273, 1282:

"The manner in which the requirements [of section 41] may be proved has been the subject of varying interpretations. Some cases have held that a hearing as to the merits and the amount of the award must be conducted. [Citations.] Others have held that

section 41 petitions could be granted [citation] or denied [citation] without a hearing, where the pleadings or the evidence adduced at trial demonstrated the falsity or truth of the statements complained of, or where a hearing would have required a virtual retrial of all the issues of the case. [Citation.] Another case has emphasized the use of the word "summarily" with regard to the trial court's power to tax fees under the section, in response to a petitioner's claim that a hearing should have been held. [Citation.] Thus, the necessity for a hearing, of what type, has been said to vary with the circumstances surrounding the motion. [Citation.] * * *

Perhaps the best statement of the rule, is that a hearing is dictated where one is necessary to determine whether the requirements of section 41, that the statements be made without reasonable cause and be found to have been untrue, have been met. If those requirements can be proved or rebutted from the pleadings, trial evidence, or other matter appearing in the record, perhaps then no hearing on the merits is needed or should be required."

See also *Brokaw Hospital v. Circuit Court* (1972), 52 Ill. 2d 182, 287 N.E.2d 472.

■ In light of the above authority, we conclude that the trial court's handling of the section 41 motion was proper. All pertinent evidence on the question of Mr. Catalano's belief concerning the source of the payment was received in the course of the trial on the merits, and nothing was to be gained by having the testimony repeated or the meaning of this testimony reargued.

### III.

■ The Catalanos have asked this court to award them attorney's fees for defense of the bank's cross-appeal. The rule is well established that attorney's fees and the expenses of litigation are not allowable to the successful party in the absence of statute. (*City of Chicago v. Fair Employment Practices Com.* (1976), 65 Ill. 2d 108, 357 N.E.2d 1154.) The Catalanos have not cited, nor are we aware of any statute, authorizing this court to award attorney's fees to a successful litigant. (See *Brandow v. Interstate Bond Co.* (1968), 91 Ill. App. 2d 215, 233 N.E.2d 579.) Accordingly, the Catalano's request for attorney's fees is denied.

For the foregoing reasons, the judgment of the Circuit Court of Du Page is affirmed.

Affirmed.

SEIDENFELD, P. J., and WOODWARD, J., concur.